I think that is Epichan v. Attorney General. I do want to thank, Strandews, you're from Pueblo, is that right? Strandews? Kirkland is from Pueblo, no? Yes, Your Honor. Okay, I want to thank you and your firm. I assume that those with powers that be at the firm who make these decisions to undertake the representation are the folks who are at council table who are strewing that out here. Yes. Probably it's the associate who argues the case who actually thought that, usually from having worked for myself, the person who does all the work doesn't usually argue the case. But whoever did the work on this, it's a tremendous job of representation. And thank you and the firm for undertaking the representation, especially in immigration cases and in some criminal cases. We just couldn't function without the generosity and the diligence of folks who did this pro bono. So thank you very much. And if you first weren't responsible for making the decision, please convey that back to whoever at the firm is responsible for these decisions. It's greatly appreciated. And I know I'm speaking for my colleagues and the entire court when I say that. Thank you, Your Honor. It was a team effort. As we say in South Philadelphia, you're done good. Thank you. That's an inside Third Circuit kind of joke. Thank you. I'm going to try your name. If I'm wrong, don't humor me by telling me that's OK. OK, Your Honor. Yevchen Zosky? That's actually right on. Are you saying that? First time that's happened. Yeah. The last time, too. Thank you. Thank you so much for your efforts. Good morning. May it please the court. My name is Christina Ettingyowski. What you said doesn't sound like what I said. I appear on behalf of the petitioner, Mr. Arturo Espichin. And I'm here in support of his legitimate application that he derived citizenship on March 21st, 1990, when his father naturalized, a fact that was agreed upon by the United States government for 12 years and only three years ago came under attack. And at that time and as a result, Mr. Espichin has been sitting in jail. The relevant issue here is United States Code 1432A3, which was enacted in 1994 and repealed in 2000. And that statute specifically gives automatic naturalization of a child born outside of the United States to alien parents upon the naturalization of one parent insofar as that parent naturalized. There was legal custody of that child. The child was under the age of 18 years old. We've got all that. But let me go back to the beginning. There appears to be a tension in at least a reading of our cases as to whether you follow who has the burden of showing, in effect, no issue of material fact. And there's a Joseph case from our court, which I think Judge McKee wrote. And it basically says you look to the Rule 56 summary judgment standard. And then there's a case called Bagot from our court from 2005, which says when you are determining the merits of a citizenship claim, then the burden is on the party claiming citizenship. Which of those two cases in this context do we follow? Well, Your Honor, I would submit that to the extent this court proceeds with the Joseph matter and this court does not. That's the answer I expected, but why? Well, Your Honor, I would submit that the evidence is so one-sided in this case, and there is no competing facts. And because there are no competing facts, some of the… It's a burden, though. That doesn't answer the question. Yeah. We'll get to the merits or talk about that. But if you're dealing with I claim I have citizenship, the government puts me to the test. The burden is on me, is it not?  But in this context, if you apply the Rule 56 standard, you get a lot more presumptions in your favor and a lot more benefits than you would if the burden were completely on you. But when do I apply Joseph in this type of case, and when do I apply Bagot in this or some other type of case? I'm just trying to figure out the distinction. Your Honor, I would argue that Bagot is the appropriate case here, and the reason for that… Bagot is the appropriate case? I'm sorry. Joseph is the appropriate case. I apologize, Your Honor. And that is because the inferences must be drawn as against the government, and that's also because there's another case that I would like to point to, which is also Fang Hao, which in effect says that deportation is the equivalent of a banishment or an exile, and any doubts about the imposition of this penalty should be resolved in favor of the non-citizen. Now, that case is specific to non-citizen as opposed to this one, where it's a case with regard to a citizen. Nonetheless, the danger in deporting a citizen, someone that's potentially a citizen, is too extreme. And in that regard, I would argue that Joseph remains to be the valid law and is the law that should be applied in this particular case. You know, to the extent that there is some doubt, it can't just be some metaphysical doubt. So going forward, when do I apply Joseph and when do I apply Bagot? And I realize that may be outside the context of this particular case, but I'm just looking for some help. Judge, I'm not particularly sure on when the court should apply Joseph versus when the court should apply Bagot. You said that when someone is before the court under a claim of citizenship, as Mr. Especian is, that that's different than a situation where the person may not be there with a claim of citizenship that's nevertheless resisting removal. I thought that's what you were saying. I'm not getting defensive over Joseph, but I thought that's what you were saying. Well, my point was, in the United States Supreme Court case of Fang-Hao Tan, the Supreme Court made very clear that deportation is the equivalent of banishment or exile, and the court must be... Yeah, that's a rule of lenity argument, which is not really where the question is going. That's saying, look, if there's any concern, any doubt about which way it should come out, you look at the consequences of removal and you apply rule of lenity because the consequences are pretty much tantamount to what they would be in a criminal case. That's a little bit different than what you're being asked now in terms of whether we go on the Bagot Road or the Joseph Road and why. But go ahead with your argument. Maybe we can't answer it. Your Honor, nonetheless, even if it was petitioner's burden to prove citizenship, it is our position that we have met that burden in this particular case. And the reason for that is because the only issue before this court is whether or not there's been a legal separation of Mr. Espichan's parents. Well, and if there's legal separation, but first of all, there has to be a marriage to be a legal separation. But those are not. That is correct. And the government presents at least three pieces of evidence that the father's application to file the petition for an alien relative never listed a marriage to Espichan's mother, despite listing several other marriages, three other marriages, if I recall. Secondly, the mother's application for naturalization checked the boxes. She was single, never married. And then the father's 1989 affidavit, which declared that he had never been married to Espichan's mother. Now, you've got a whole lot of evidence in your favor that there was under the tribal customs a marriage in 1970 and a separation in, I guess, 79. But with all of this, how am I supposed to sort that out and say you automatically win? The reason for that, Your Honor, is because marriage is a legal construct. What it is not is it's not an opinion. And let me just take this as an example. A person goes to Las Vegas, gets married, has a marriage certificate, comes back to Philadelphia, gets into a car accident, and loses all ability or all memory. Does that mean that he's not married? If you ask that person and say, are you married, and that person cannot remember whether or not he was married, does that make him not married? And I would argue that the same thing applies here. Whether or not you're married is not an opinion, but rather a legal construct. And that legal construct here, we have to look to the laws of the state governing that marriage or the nation. And here, that nation is Peru. Are you sure you want to say it's a legal construct? I mean, isn't it that marriage, yes, is defined under the jurisdiction, whether it is. But did Peru, I guess it's Peru in this case, recognize a 1970 marriage under supposed tribal custom? Well, there's a little bit more to that, Your Honor. But to the extent, with regard to the tribe, we have two issues here. They were, in fact, married pursuant to Incan traditions. Family members were there. There was a pilgrimage to Ancash Lake. And that indeed happened. But moving beyond. Why would both mother and father say that they were never married? Well, I think whether or not they believed that they can translate whatever happened in Peru to what they believed the United States standard was. And they're trying to translate their very rural, you know, for lack of a better word, marriage and situation and predicament in Peru into what they believed the United States was looking for on an immigration document. Perhaps the better answer. Doesn't that require some explanation from them? Because, again, it's like a lot of things. You've got evidence on both sides here. We can't find facts. Public courts can't do that. That is correct. And so in this context, doesn't this really call for a remand? Your Honor, I tend to disagree. The reason why I disagree is because it's our position that we did present a lot of facts. We presented the law of Peru. We presented the legal experts. No, it was actually directly from the Constitution. So I want to leave that aside. There was a memorandum prepared by several attorneys in Peru. But what I really want to focus on is the actual Constitution. Let's look at that. And here in Section 9 of the Constitution of Peru. Is that in your appendix? Yes, Your Honor, it is at JA 75. And at Section 9 it says the union of a man and woman free from any impediment to marriage. Free from any impediment to marriage. That's there and that's meaningfully there. And it wouldn't be there if it didn't have meaning. Who form a de facto family for such a term and under such conditions as established by law. Leads to a property system that is subject to the marital property system. These terms are not superfluous. These terms are there for a reason. And I guess in some of the states, although perhaps not in New Jersey, which is where I practice law, we don't have common law marriage. But we would define this de facto union as a common law marriage. And what's undisputed is that Mr. and Mrs. Esposito were living together. They were cohabitating from 1970 to 1979 until such time as Mr. Esposito's father came to the United States in search of superior economic opportunity for his family. Nonetheless, the relationship continued until such time as they realized that this distance was just too much for the relationship and the relationship discontinued at that point. Now, for purposes of an immigration application, when there is very little boxes, perhaps the better answer would have been, well, in my country, this was my situation. I'm not sure in the United States what you're looking for. You're looking for a translation. And in an immigration context, there has to be sympathy to the laws of the other nations because certainly those are relevant, as this court decided in both Morgan and Leslie, which are controlling on the issues. Now, the government hasn't come forth with any competing facts. They only rely on opinion. And that goes into a danger zone. And I submit the danger zone is the issue of estoppel. How could it be that Mr. Esposito's father could interfere with Mr. Esposito's rights? It's not as if Mr. Esposito has said yesterday, I'm not a United States citizen, but now comes to the court and says, I was incorrect. I am. Let's see if we can, before you sit down, put it all together. This person claims that he is a, derivatively, a United States citizen. Is that correct? That is correct, Your Honor. Okay. And if you say that, if I say I am a United States citizen and somebody challenges that, then I have to prove it, do I not? That is correct. So you're saying, I would think, I'm not trying necessarily to prove that his nationality is the United States. I am trying to tell you that there is a genuine issue of material fact as to his nationality claim. Is that correct? I disagree that there is a genuine issue of material fact with regard to his nationality. If that's the case, then it has to be Baggett that applies and not Joseph, and you want Joseph to apply because Joseph gives you far more presumptions and benefits in your favor than Baggett, which puts the burden squarely on you and your client. To the extent there is a genuine issue of material fact in dispute, I'm prepared to present those proofs to the district court and attempt to prove our case where credibility could be evaluated by the fact finder. My argument here is that we have presented evidence and the government has not challenged any of the documents. They have not come to this court, whether in their brief. On the record right now, it's not like the last case, there is evidence that would undermine, from your own client's parents, which is not disputed, the parentage here is not disputed, that they were not married. Now you can argue that they didn't understand the concept of marriage. You can argue, as you did in your brief, that they ran out of pages in the form and he listed three of the marriages and didn't have another page and it didn't say attach. But then you also have the declaration on the I form, and it is hard to get our hands around whether or not there was, a marriage is also an issue as to the separation, and that gets into what would be needed in Peru under Peruvian law to constitute separation. What kind of formality is needed? In Peru, what's needed is some sort of registry, and that's exactly what happened in this case. Mrs. Espichan's mother had gone to the police station February 19th of 1990, well before the critical time, well before the naturalization of the father, at least a month before, and announced publicly and to a governmental entity, which is what we need in both Morgan and Leslie, that's the standard, and said, I am no longer, we have made a mutual agreement to separate, we are no longer together. People in a position, for example, of boyfriend and girlfriend, wouldn't undertake to make a public announcement. So, in other words, only people that were in a marital union would take the extra step to make it both publicly known and to solidify that in a governmental entity. Well, arguably, if that happened in 79, it did, that's not controversial. And they'd been living together from 70 to 79 under Peruvian law, that would seem to establish a common law relationship, and call it boyfriend-girlfriend if you want to. But, well, not to call it that, because I don't know how Peru looks at common law, but that might undermine the marriage argument. Absent what you just said about boyfriend-girlfriend, that nine-year relationship would seem to establish a murder relationship under Peruvian common law. I'm sorry, Your Honor, I don't think I heard the last part. I agree with that. With the acknowledged facts that they lived together for seven years, had three children, that they took a step, that the wife took a step at the end of the seven years to formally establish a separation, is there a material issue of fact if the parent says, if both parents say we weren't married, if under what would appear to be the law of Peru, they were married, is their denial sufficient to create a material issue of fact, or do the acknowledged facts, when viewed in light of the law, establish a marriage that their denial cannot obliterate? Either under Bagot or Joseph's. I understand. Whether or not they understood the law in Peru, it doesn't make it that their understanding or misunderstanding is correct. In fact, it was incorrect. They probably didn't understand the law in Peru. I'm not sure where they were coming from when they made that affidavit. It's an affidavit that's taken out of context. So does it then become irrelevant as to the issue of marriage if you have acknowledged facts establishing marriage under Peruvian law, their individual opinion that I wasn't married, is that relevant or irrelevant? I believe that's irrelevant. You will never, no matter how long you practice, ever get a slower softball than the one she just tossed to us. I used to love softball myself. I believe it's irrelevant, and even more so, I believe it's non-dispositive. It's non-dispositive because we have to look to the law, and what you believe the law to be is not what the law is. So whether or not it was held with intent to deceive or not, and I don't believe it was the former. Assume it was, assume it was intent to deceive. Because my guess is that Mr. Rabin may well argue that. It's not an insubstantial argument, so assume that it was an intent to deceive for whatever reason, benefits of whatever reason, and then go ahead with that. I'm still under the impression that it would have no dispositive effect. It's not probative on the issue of whether or not they were married pursuant to Peruvian law, because Peruvian law says, pursuant to our common law, you're married. You lived in a communal household for nine years. You had three children together. You were in the same marital residence. You announced to the world, whether in Peru, I should say in Peru, not the world, but you announced to Peru that you, in fact, were living together in this marital household. That's how you presented yourself, and that's the standard in the states that we have with common law that accepts common law marriages. How do you hold yourself out to the public? And in Peru, that's exactly what they did. Now, whether they mistranslated that into a form that's very simplistic or prepared an affidavit that's probably taken out of context, we don't really know the context for that. It's still my position and my submission that they were married pursuant to Peruvian law, and their opinion on that does not negate the fact that they were, in fact, married. I see that my time is up, and I believe that I unintentionally forgot to ask for three minutes for rebuttal time. Thank you. Thank you. Thank you. I've never seen that before. You took the long way around. I'm sorry. Do you want me to go back? I've never seen that before. He wants another 30 seconds. Get your steps in your wing. You have one of those Fitbit thingies. We all want to be original, Your Honor. May it please the Court. Arthur Rabin on behalf of the Attorney General. It is the government's position that there is no genuine issue of material fact and that Begote is the proper way, the lens to view this case. How so? Because petitioner – well, first of all, Begote is the case that relies on Supreme Court precedent that specifically states that the burden is on petitioner because citizenship is a high privilege which must be earned. What about Augusto? Augusto, 78 case, comes after McIntosh. It does, but obviously Supreme Court precedent is Supreme Court precedent. The point I'm trying to make is then numerous cases of this court also relied on Begote. They're unpublished, admittedly. But they did because even logically speaking, somebody that claims United States citizenship, a high privilege according to the Supreme Court, should be able to prove it. Thus, the United States should be able to say, well, if you come forward with enough evidence, you'll overcome the presumption of your alienage. That is, you were born abroad, and the presumption arises, and everybody recognizes that you are an alien. Thus, under Begote, it is proper to have that presumption apply, and then anything, all evidence should be most – But don't we have a preliminary question here as to whether there is evidence of a material issue of fact that needs to be resolved. And if there is an issue of material fact that needs to be resolved, Joseph says that we use a Rule 56 standard because that goes back to Augusto, which in effect comes after and therefore supersedes McIntosh. And it would seem that, based on my questions to your opposing counsel, that that's where we are right now. We're not in the realm yet of the merits of whether there is citizenship or non-citizenship. Well, Your Honor, I mean, it's the government's position that there is no genuine issue of material fact, because the facts in this case – Well, they put a whole lot of information in. It may be conflicting, Your Honor, but it is up to, under De Novo, this Court's Noah Powers, to then find out which is the convincing view of the evidence. That is, whether the presumption has been overcome. We don't find facts. We just say that there is a material issue or an issue of material fact that's in dispute, and somebody needs to resolve it. But you don't win automatically. At the very least, they get to fight another day. Well, Your Honor, they have to demonstrate that they've overcome the presumption. They have to put forward sufficient evidence. Not under Joseph. Not under Joseph. That's the reason for my question. But that's why we're saying there is no genuine issue of material fact. And both counsel agree there isn't, because the evidence in this case, based on what has already been put forward – Yeah, but both are saying it isn't, and going the other way, right? Well, but, I mean, you haven't heard my argument yet. So I am not contesting the facts put forward. That is, whether or not they honestly believe they were married or not, we're saying regardless of that, that under, right now, the state of the evidence in this case, under Peruvian law, it has not been – they have not overcome the presumption of their alienage. That is, so as – Well, why is that? It's uncontested that they were married. You're not taking issue with that, right? At one point – Yes, I am, Your Honor. You're saying from 70 to 79, they were not married. It has not been shown they have been married. So – What about the expert that you have, Peruvian law firm, saying that who does recognize common law? You're contesting, I guess, the existence of the Incan? Right, so we're – what I'm arguing is that they have not shown, in accordance with their presumption of evidence, their burden, they have not shown that that relationship they entered was, under Peruvian law, a marriage. What they point to are two things. The 1979 Constitution, which post-dated their relationship, because their relationship ended in 1979, and the 1984 Civil Law Act, the Civil Act in Peru. So if we look at the very first one, 1979 Constitution, that is not clear it applies retroactively to relationships that ended in 1979. Did you argue that in your brief? We have – I'm not sure I argued that in my brief, Your Honor. The point I'm trying to make is that we argue it is their burden and that they did not recognize themselves as married. And as part of that argument, what I'm saying – and I did argue there's no genuine issue of material fact. As part and parcel of that argument,  So – but they've got – you've got at least five items of evidence. The mother's 2018 affidavit that says she, quote, got married in – according to the Pachis culture, with a simple ceremony, and that was accepted as a marriage under the tradition of the Pachis. The father's 2018 affidavit that says, In Peru, I maintained a convivial relationship with the mother, which we initiated in 70, being single without matrimonial restrictions, setting as common address, et cetera. We accepted as having a traditional matrimony, and he declared since September 30 of 70, I started a married life with the mother. And then the aunt's affidavit corroborating the police complaint that was filed that says that they have lived together and by mutual agreement made the decision to separate. And the legal memorandum from the law firm of Peru saying that the parents had a formal de facto marital union. Okay, so addressing all of that. Again, just because they say something, just like Counsel said, that doesn't mean it's so. So under the law that we have right now on the record, the 1979 Constitution specifically requires, we don't know, first of all, it applies to their marriage to recognize that de facto marriage. Who sorts that out? Well, Your Honor, I mean, it's their burden to come forward with that evidence. You've come forward and you haven't argued that it does not apply, have you? I mean, that's the first time today that I've heard that argument. You know, I looked and I saw the date 1979, but no one was questioning that. But assuming it does apply, Your Honor, assuming you're correct, we haven't argued that. But it's specifically said that the 1979 Constitution says recognize de facto marriage but only, quote, under such conditions as established by law, which they haven't shown what those conditions are under the 1979 Constitution. I thought they had shown that traditional Incan marriages are recognized by Peruvian authorities. Then they point to something else, the 1984 civil law, which then states that de facto marriages can't be entered into by mutual agreement of the parties. Now, the mutual agreement of the parties doesn't seem to have existed in this case because in 1989 and all those other, Your Honor quoted, the N400s, they all said they did not consider themselves married. So there was no mutual agreement. When they had their Incan ceremony, and I assume neither until today, I understand you might be contesting the fact of the ceremony. I thought it was given they had the ceremony. Why wouldn't that language you just read be such as to recognize a legal relationship arising out of the Incan ceremony in 1970? Because it had to have been entered by mutual consent. What we're saying is one of them dragged the other into the debate. They were both there, weren't they? Well, but then they both said they weren't, that they only did it because their parents wanted them to. Well, I mean, I did a lot of things because my parents wanted me to. I had one of my best law clerks was in a relationship many years ago. It was an arranged marriage. And she convinced me those were really good things. But you only got married because your parents wanted you to. So I don't understand where that gets you. In a lot of societies even today, people only get married because their parents want them to. That doesn't mean it's not a valid marriage. Well, but they still have to demonstrate that on Peruvian law it was. And that's the whole point I'm making, is that they haven't. But even if we want to move on and assume, for the sake of argument, that they were married, was there a legal, quote-unquote, separation of the parties? And as we have argued, there wasn't. And all they have shown is this 1984 civil law. Why wouldn't the police station, with them going and acknowledging that they no longer wanted to be in a relationship, which looks to me like a married relationship, and withdrawing from that, why wouldn't that be? They didn't go to the neighborhood bar and say, you know, I'm tired of this guy. They went to a police station, some imprimatur of authority. Why wouldn't that be sufficient? To quote a couple of counsels ago, three points. One is that we have to question, first of all, there's no original document here. What we have is hearsay years later being recorded during proceedings. So it's questionable. Number two, we know the husband wasn't there. So how could it be? The document with the police. The document with the police. Right. So when they went, the mother went to the police. Yeah. And that document no longer exists? Right. The document no longer exists. There is no original. What we have is a notation in a police book that a document had existed at a certain time, noting that the mother came forward with a report. Does she have a copy? No. So at this point, all we have is a basically hearsay. Then we know that the document itself is questionable because the father wasn't there. The police report specifically says the father was there. We know he wasn't because in his affidavit, he says he only has knowledge of her coming forward to make that police report. And she says in her declaration that she went there by herself. So again, you're saying because it's in the police blotter that he wasn't there, you're saying that's credible evidence that he wasn't there. No. What we know is from their statements, they say only the mother came forward. Because when she made this report in 1990, she in her statement specifically says she came forward by herself. Does that matter? I mean, if he's gone off to America and she says this relationship is over, it sounds pretty over to me. Well, but she according to the police report, that supposedly we're all counting on the Lydia, it was supposed to be by mutual consent. How mutual can it be when one of the parties is not there? Well, if he's in America, it's expensive to come back down to. Well, but so, again, even if we disregard that it's not mutual, maybe he's in America and he gave her consent to do that. We have to question what actually happened because of the discrepancies in the process here. The original is missing. The husband wasn't there. And all we have is, you know, so later substituted interpretation of counsel they hired during proceedings to determine the validity of, because this proving counsel then puts a spin on it and says, oh, yeah, that's mutual separation under Peruvian law. We don't know that because there are at least under Morgan is required some kind of judicial or administrative and premature or some kind of action by a court or administrative. There is no such action here. What we have is just a recording in a civil. Well, we don't have the report. We have a recording of a recording that something happened. And we know that something didn't exactly happen the way they say it happened. How do we deal with this? And this comes up with some regularity in these kinds of cases. How do we deal with the situation where we're looking at this by definition, almost through an ethnocentric lens, an industrial lens? Give an example. Years ago, I remember a case we had, immigration case, where one of my colleagues was concerned that there was no corroboration because the person said they went to a hospital, but there were no hospital records. And I immediately flashed in my mind a driver I was taking from Accra to Kamasi in Ghana, and I saw this building, you can call it a building, and it said outside hospital. Some of the letters were missing, but it reported to be a hospital. No utility lines going into or out of it that I could see. But in terms of the local community, that's where they went, and they considered that a hospital. If we are to impose upon, and I don't think Morgan requires this, impose upon folks in what appears to be a very small, non-industrialized village in Peru, that they get some kind of official document, which they tried to do, which then, really not surprisingly, 50 years later, they can't find it. You could actually argue, look, if you could find the document under these circumstances 50 years later, that may be an issue of a foreign document, because why would it be kept around? How do we wade through all that? I'm not saying it very well, but I think I understand what you're trying to say. Well, I think, again, to quote the other guy, two points. One is what we know what Morgan requires is that when you have these kind of impromptu marriages, these de facto marriages, you need something more substantial than their just their say-so that it ended. And that's why I decree. You mentioned the Morgan case, and there's a footnote for that case. Yes, Your Honor. It says the formal action need not necessarily be a judicial decree. The state or foreign nation, for example, could allow administrative agency or other governmental body to issue orders of separation. There's nothing in the language of the statute that requires that a court must act for legal separation to exist. Conceivably, some jurisdictions might consider parties legally separated if they lived apart for a period of time without seeking any governmental imprimatur. And some of the evidence has been put forward by the other side indicates that maybe that's the case that happened in Peru. They lived separately for a number of years. Well, and when the mother came to this country, she did not try to join up with the father again. No, she she was OK. So the reason she came forward to make this police report, her kids were about to travel to the United States and they had done everything they possibly could to separate themselves. So they both stated that the mother and the father, the mother. She executed a power of attorney in his favor, not calling her him, her husband in the power of attorney. But she gave his power of attorney saying the kids are his. She he then comes forward with an affidavit right before naturalization says I've been never married to her. She's the only the mother of my children in his four hundred petition naturalization. He listed all his prior spouses, the three other ones, but not her in her and four hundred. She lists herself as single, never married. So this couple had done everything possible in every official document to separate themselves and say they never had this relationship. So for this court to extend Morgan's footnote, he admitted the relationship. That is a couple. And that's basically that it be dissolved. Well, it wasn't. So what we know is under Morgan. Yes, there may be some jurisdiction. Do we know Peru is that jurisdiction? No, we do not. Because under the nineteen eighty four statute, the language of the statute specifically references judicial action. It's really the same question they set aside. We can't find facts. Therefore, doesn't this really need to be sorted out? You don't need to find facts. You just need to look at the record. They're saying just exactly. Just look at the record. And you're saying just look at the record and we can't make findings of that district court can. No, I agree, your honor. But I think both parties also agree that we're not disputing the actual facts and what a district court judge can actually find later. I'm not sure, because at this point, the evidence is the evidence. I mean, unless we time travel to figure out what else I would just change one word with the district court will find later. I'm not sure, but it can find one way or the other. Well, there's a court can make factual recommendations to the court. And then, you know, if we should refer this then to a district court. In what state should that be in New Jersey or Eastern District of Pennsylvania? Your honor, I think it should be where they're domiciled. I would have to defer to my co-counsel or opposing counsel. You know where he's housed? Where he's housed? Where he is housed. He's in detention. I'm not sure where like how convenient it would be to depose him or his wife or his kids or any of that. So I'm not sure. I don't want to wing it here, but I see my time is up. But just to conclude, your honors, we don't believe there's a generation material fact, because this court can decide de novo on the facts here that there was no legal. We don't want to take the word legal out of separation. And that legal is under Morgan has to be some kind of judicial or administrative premature, especially in cases where the evidence is so muddled of what their relationship actually was under proof of the animal. Subject to the court's questions. Thank you. So let me ask you, if we decide there is an issue of material fact and the case should be sent to a district court, what district court should that be? The United States District Court for the District of New Jersey. Why is that? All relevant parties are all domiciled in New Jersey. Mr. Esposito is incarcerated at Essex County Correctional Facility and his family. All of them reside in New Jersey. In Newark or Trenton or Camden or? Newark, Newark, your honor. Newark, your honor. Just a brief point. The government points to Article 326 and says that there must be mutual agreement in order for there to be a legal separation. Article 326 of the Peruvian Civil Code. And I disagree because the plain language asks for mutual agreement or unilateral decision. Now, I would say here that both again ask for mutual agreement or unilateral decision. That's how a union, in fact, may end. And there's some other possibilities there as well. But as applied herein, unilateral decision surely is met by Mrs. Esposito going to the police station on February 19th of 1990 by herself and announcing publicly and in Peru and to the government in Peru that she longed for the separation with her husband. And also in that record, there is occasion where it speaks of that mutual agreement. In addition to that. But don't move past where in the record? In the police. But he's saying that what you've got in the police report is it's not really the police report. It's a notation of the fact that a police report was taken and made. Well, I, I, I disagree. It says certifies that in the police complaint book corresponding to the year 1990 is found a complaint whose literal character is as follows. Moving on with that, when we get to the bottom of the police report, it says that they've lived together from 1970 to 1979. And by mutual agreement have made the decision to separate. It uses that language right in the police report. In addition to that, Mr. Esposito's father, German, had petitioned for his children in 1986. Who he didn't petition for is his wife, Margarita. But in any event, maybe we're complicating this more than we need to. And correct me if I'm wrong. Maybe I should ask Mr. Redmond to correct me because you're not going to correct me because it helps you. But I thought the BIA had accepted the fact of the Incan marriage as well as a relationship that would be recognized as marriage under Peruvian common law. I thought that was not a debate at all. I thought that wasn't, in fact, accepted. The only issue was whether or not subsequent conduct, the way the forms were filled out, the omissions in particular, and the outright denials, whether or not those were sufficient to establish the separation that you need under American law to show the end of the Peruvian relationship. I thought we were there without any real dispute. But I'm not so sure now. I agree with Your Honor's interpretation. As a matter of fact, it's the first time that I've heard from the government that documents have been challenged and the Constitution has been challenged. It was never before up until moments ago that were these documents challenged or the authenticity of the documents challenged. I see that my time is up. OK, thank you. Let me be a little bit unorthodox. But let me ask you, Mr. Redmond, am I incorrect in that? Well, you want to come to the microphones because we're recording. He did it again. You get twice the number of steps. Yeah. He's thinking again. Yeah. Page two of the BIA decision, the very last paragraph, the board specifically said, The record supports the IJ's determination that DHS presented evidence indicating the respondent's father was never married to the respondent's mother. That's a clear cut statement from the agency that there was no marriage. And if you do want to respond, I don't know how to respond. If you want to just hit the 28 day letter. OK. OK, thanks. Thank you. Take the matter into advisement. Very interesting. Really interesting case. And we're incredibly well argued by both sides. So we thank you both for a good argument, even though it's a hard case. Hard cases reason are always easier. We have really good attorneys making solid arguments based upon the record of the law. So I thank you both for that.